IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Michael M.,[1] | ) | C/A No.: 1:23-3728-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Kilolo Kijakazi, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court
for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B)
(D.S.C.), and the order of the Honorable Joseph Dawson, III, United States
District Judge, dated August 7, 2023, referring this matter for disposition.
[ECF No. 6]. The parties consented to the undersigned United States
Magistrate Judge's disposition of this case, with any appeal directly to the
Fourth Circuit Court of Appeals. [ECF No. 5].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) and § 205(g) of
the Social Security Act ("the Act") to obtain judicial review of the final
decision of the Commissioner of Social Security ("Commissioner") denying the
claim for disability insurance benefits ("DIB"). The two issues before the

---

[1] The Committee on Court Administration and Case Management of the
Judicial Conference of the United States has recommended that, due to
significant privacy concerns in social security cases, federal courts should
refer to claimants only by their first names and last initials.

court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On April 21, 2022, Plaintiff filed an application for DIB in which he alleged his disability began on March 13, 2020. Tr. at 65, 179–85. His application was denied initially and upon reconsideration. Tr. at 86–90, 92–96. On March 2, 2023, Plaintiff had a hearing by telephone before Administrative Law Judge ("ALJ") Tammy Georgian. Tr. at 28–56 (Hr'g Tr.). The ALJ issued an unfavorable decision on March 15, 2023, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 11–27. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on August 1, 2023. [ECF No. 1].

B.     Plaintiff's Background and Medical History

1.     Background

Plaintiff was 34 years old at the time of the hearing. Tr. at 28, 207. He completed a bachelor's degree. Tr. at 35. His past relevant work ("PRW") was as a credit machine operator, a storage clerk, and a flooring/covering salesman. Tr. at 50–51, 54.  He alleges he has been unable to work since March 13, 2020. Tr. at 207.

2.     Medical History[2]

On June 1, 2021, Plaintiff complained of anxiety and requested a medication change. Tr. at 1005. His score of 19 on the patient health questionnaire 9 ("PHQ-9") was consistent with moderately-severe depression and his score of 21 on the general anxiety disorder 7 ("GAD-7") suggested severe anxiety. *Id.* He described increasing panic attacks, irritability, and sleeping six hours per night. *Id.* Family nurse practitioner Stephanie Hebberd ("NP Hebberd") recorded normal findings on general exam. Tr. at 1006. She refilled Prozac 20 mg and prescribed Buspirone 7.5 mg twice a day. *Id.*

On July 30, 2020, Plaintiff reported worsened psychiatric symptoms since his medications were changed. Tr. at 1008. He endorsed daily panic

---

[2] The undersigned has summarized Plaintiff's mental health records, but has declined to address records regarding his physical impairments, as the arguments focus only on mental impairments and functioning.

3

attacks, denied suicidal ideation, and said he did not sleep well on some days and slept all day on other days. *Id.* His score of 15 on the PHQ-9 was consistent with moderately-severe depression and his score of 21 on the GAD-7 suggested severe anxiety. *Id.* NP Hebberd observed Plaintiff to appear anxious and have flat affect and poor eye contact. Tr. at 1009. She referred Plaintiff to psychiatry, discontinued Prozac and Buspirone, and prescribed Wellbutrin XL 150 mg with instruction to titrate it up to 300 mg after three days. *Id.*

Psychiatrist Kathleen M. Phelps, M.D. ("Dr. Phelps"), conducted a mental health consultation on December 15, 2020. Tr. at 749. Plaintiff reported having experienced traumatic incidents during his military service in Iraq and Afghanistan. Tr. at 750. He endorsed associated intrusive thoughts, nightmares, chronic avoidance of crowds, chronic hypervigilance, easy startle, and significant anxiety. *Id.* He indicated his primary care physician had prescribed multiple antidepressants. Tr. at 751. He said his current medication included Bupropion 300 mg for anxiety. *Id.* He described episodes of shortness of breath, anxiety, and hyperventilation that caused him to have to sit down, as well as "full-blown panic attacks." *Id.* He reported sometimes being unable to get out of bed due to depression and episodes of decreased interest and motivation and significantly-increased anxiety. *Id.* He described obsession with order such that he experienced extreme agitation

4

and anxiety when items were not organized alphabetically and preoccupation with matching colors such that he could not wear clothing of different colors. *Id.* He said he was a "neat freak" and experienced significant anxiety due to the normal mess caused by his children and dog. *Id.* He endorsed recent erratic sleep. *Id.* He denied psychiatric hospitalizations, suicide attempts, and suicidal thoughts. *Id.* He noted he was homeschooling his children, ages five and seven, due to the pandemic and was doing freelance writing and editing for a website called study.com. Tr. at 752. He stated he enjoyed video games and spent most of his time with his family. Tr. at 752–53.

Dr. Phelps recorded normal findings on mental status exam ("MSE"), except that Plaintiff's mood appeared tearful at times, his affect was distressed and tearful when discussing military incidents, and he "definitely ha[d] PTSD related avoidance." Tr. at 753. She assessed a global assessment of functioning ("GAF") score[3] of 53,[4] instructed Plaintiff to take Bupropion at lunchtime, and ordered baseline lab studies. Tr. at 753–54.

---

[3] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("*DSM-IV-TR*"). The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.*

[4] A GAF score of 51–60 indicates "moderate symptoms (e.g., circumstantial speech and occasional panic attacks) OR moderate difficulty in social or

Plaintiff participated in a psychiatric medication management visit on January 25, 2021. Tr. at 736. He reported fairly good mood overall, except for a lot of anxiety characterized by panic, generalized anxiety, and symptoms of obsessive-compulsive disorder ("OCD"). Tr. at 737. He endorsed chronic sleep problems, including difficulty falling asleep. *Id.* Dr. Phelps noted normal findings on MSE, aside from "mood guarded consistent with PTSD related avoidance." Tr. at 739. She assessed a GAF score of 53, prescribed Trazodone for sleep, and continued Bupropion 300 mg daily for PTSD. Tr. at 737–38, 740.

Plaintiff presented to Maxine Pegram, Psy. D. ("Dr. Pegram"), for an initial mental health assessment on January 26, 2021. Tr. at 719. He reported once-a-week panic attacks on his current medication routine. Tr. at 720. He endorsed interrupted sleep characterized by night sweats, nightmares, and difficulty falling asleep. Tr. at 722. He said he played video games, but did not have friends or go out. Tr. at 723. Plaintiff's score of 16 on the PHQ-9 suggested moderately-severe depression. Tr. at 724. He reported anxiety around crowds. Tr. at 725. Dr. Pegram observed the following on MSE: attentive, depressed, and tearful appearance; cooperative, alert/attentive behavior; normal speech; depressed mood; congruent affect; normal perceptions; normal thought content; coherent thought process; alert

occupational functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV-TR.*

and oriented orientation and consciousness; intact language; fair judgment; and no reported cognitive or memory impairment or difficulties, self-care impairments, or logistical issues concerning treatment services. Tr. at 728. She provisionally diagnosed posttraumatic stress disorder ("PTSD"). Tr. at 729.

Dr. Pegram noted euthymic mood and normal perception and speech on February 12, 2021. Tr. at 716. Plaintiff complained of constant irritation and frustration. *Id.* He said he sometimes felt justified in his behavior, but realized he overreacted at other times. *Id.* He said his reactions had affected his children, relationships, and employment. *Id.* He endorsed panic attacks three times weekly and indicated he isolated due to a history of panic attacks in public. *Id.* Dr. Pegram provided Plaintiff with methods to calm panic attacks, including meditation and breathing exercises. Tr. at 717.

On March 12, 2021, Plaintiff reported Trazodone was helpful for sleep. Tr. at 705. Dr. Phelps recorded mostly normal findings on MSE, but observed that Plaintiff's mood was guarded "consistent with PTSD related avoidance." Tr. at 707. She assessed a GAF score of 53, discontinued Bupropion, and directed Plaintiff to slowly retrial Venlafaxine. Tr. at 705, 707.

On March 19, 2021, Dr. Pegram noted Plaintiff's euthymic mood and normal perception and speech on MSE. Tr. at 701. She stated Plaintiff

"appeared calm and was []very engaged although often losing his train of thought" and requiring redirection at times. *Id.*

Dr. Pegram observed Plaintiff to demonstrate depressed mood and normal speech and perception on April 9, 2021. Tr. at 694. Plaintiff reported daily dramatic mood swings, anger, and headaches since starting Venlafaxine. *Id.* He indicated his stress had been reduced since he stopped looking for employment. *Id.* He endorsed increased nightmares and said he was in the process of training his service dog. *Id.* Dr. Pegram noted Plaintiff was working on breathing exercises, but sometimes started them too late for them to be effective. *Id.*

Plaintiff conferred with Elaine M. Carroll, M.D. ("Dr. Carroll"), for psychiatric medication management on April 21, 2021. Tr. at 684. He reported inability to tolerate Venlafaxine, with worsened mood swings and irritability. *Id.* Dr. Carroll recorded normal findings on MSE, aside from reports of anxiety and rapid mood changes. Tr. at 684–85. She discontinued Venlafaxine and prescribed Prozac 20 mg. Tr. at 685.

Dr. Pegram noted euthymic mood and normal perception on April 23, 2021. Tr. at 677. Plaintiff reported he and his wife had decided he should discontinue his search for work because of his symptoms of irritable bowel disease ("IBS"), PTSD, and anxiety. *Id.* He stated he was attempting to train

his service dog to assist him. *Id.* He denied mood swings and headaches since stopping Venlafaxine. Tr. at 678.

Plaintiff participated in a medication management visit on May 10, 2021. Tr. at 665. He reported doing okay overall. Tr. at 666–67. Dr. Phelps noted mostly normal findings on MSE, but indicated Plaintiff had a "tendency for some minimization." Tr. at 668. She assessed a GAF score of 53 and continued Plaintiff's medications and therapy. Tr. at 668–69.

On May 14, 2021, Dr. Pegram observed Plaintiff to demonstrate frustrated mood and normal perception and speech on MSE. Tr. at 660. Plaintiff denied recent night terrors, but reported waking drenched in sweat 10 times per night. *Id.* He said he felt annoyed by "little things." *Id.*

Dr. Pegram noted Plaintiff's euthymic mood, normal perception, and normal speech on June 3, 2021. Tr. at 657. Plaintiff stated he had noticed further decline in his father's memory during a recent visit to Montana and was considering moving his father into his home. *Id.* He reported he was experiencing nightmares he could not recall and waking in cold sweats. *Id.* Dr. Pegram noted Plaintiff was having difficulty with breathing exercises, struggling with anxious feelings, and worried about his father. *Id.*

On June 17, 2021, Dr. Pegram noted euthymic mood, varied perception, and normal speech on MSE. Tr. at 655. Plaintiff reported difficulty controlling his temper and being especially short-tempered with his children.

*Id.* He related that a friend from his unit had recently committed suicide. *Id.* He said he recently woke during the night in a panic and was unable to go back to sleep, but could not recall his dream. *Id.* He indicated he was struggling with panic attacks. *Id.* Dr. Pegram suggested anger management classes, and Plaintiff indicated he would consider them. *Id.*

Plaintiff participated in a medication management visit on June 28, 2021. Tr. at 643. He reported he had significantly reduced his alcohol use. Tr. at 644. He endorsed a lot of anxiety, panic, OCD symptoms, and being "quite somatic." *Id.* He indicated he woke frequently during the night with nightmares and night sweats. *Id.* Dr. Phelps recorded mostly normal findings on MSE, aside from significant somatization. *Tr.at 646.* She assessed a GAF score of 53, added Prazosin 1 mg for nightmares, and reduced Prozac to 10 mg. Tr. at 644, 646–47.

Dr. Pegram noted Plaintiff's anxious mood and normal perception and speech on July 9, 2021. Tr. at 638–39. Plaintiff shared that he had recently overreacted when his ducks failed to respond to a call. Tr. at 639. He said he immediately "grabbed a gun" because he assumed there was a dangerous situation and was concerned that his first instinct was to get his weapon. *Id.* Dr. Pegram noted Plaintiff was starting to recognize his overreaction and had agreed to participate in anger management classes. *Id.*

Plaintiff reported passive suicidal thoughts to social worker Molly Tomlinson ("SW Tomlinson") on July 19, 2021. Tr. at 635. SW Tomlinson's impression was that Plaintiff had intermediate acute risk and low chronic risk of suicide. Tr. at 636.

Dr. Pegram observed Plaintiff to demonstrate anxious mood and normal perception and speech on July 19, 2021. Tr. at 632. Plaintiff described a panic attack while he was in Home Depot that led him to leave the store and call his wife to pick him up. *Id.* He said he was unable to attempt breathing exercises because he received no warning prior to the attack. Tr. at 632–33. Dr. Pegram advised Plaintiff to continue breathing and mindfulness exercises. Tr. at 633.

Plaintiff actively participated in a group counseling session on July 20, 2021. Tr. at 630. Social worker Dennis Ward ("SW Ward") noted Plaintiff's minimal progress toward his goals and objectives. *Id.*

Dr. Pegram observed Plaintiff's depressive mood and normal speech and perception on July 26, 2021. Tr. at 626. Plaintiff reported continued panic attacks of lesser severity. *Id.* Dr. Pegram encouraged Plaintiff to practice breathing exercises and visualizations. Tr. at 627.

Plaintiff made good use of a group counseling session on July 27, 2021. Tr. at 623. However, SW Ward noted Plaintiff had made minimal progress toward his goals and objectives. Tr. at 624.

11

SW Ward indicated Plaintiff made only fair use of a group counseling session on August 3, 2021, as he did not share his reaction to the meditation exercise. Tr at 620.

SW Ward described Plaintiff as making good use of a group counseling session on August 10, 2021. Tr. at 618. However, he indicated Plaintiff had made only minimal progress toward his goals and objectives. *Id.*

Plaintiff reviewed his medications with Dr. Phelps on August 16, 2021. Tr. at 603. He described a recent panic attack in Home Depot and noted he had contacted the crisis hotline due to suicidal feelings, although he denied current suicidal and homicidal feelings. Tr. at 604. Dr. Phelps noted Plaintiff's mood was irritable and reactive. *Id.* She otherwise recorded normal findings on MSE, aside from subjective irritability in public and significant somatization. Tr. at 606. She assessed a GAF score of 53, discontinued Prozac, continued Plaintiff's other medications, and prescribed Bupropion 150 mg for two weeks and then 300 mg each morning. Tr. at 606–07.

Plaintiff made good use of a group counseling session on August 17, 2021. Tr. at 599. SW Ward noted Plaintiff had made minimal progress toward his treatment goals. *Id.*

Dr. Pegram observed Plaintiff to demonstrate anxious mood, struggling perception, and normal speech on August 23, 2021. Tr. at 595. Plaintiff expressed frustration with the results of a recent compensation and pension

exam and indicated he had felt overwhelmed and irritated when he went hiking with his wife. *Id.* Dr. Pegram instructed Plaintiff to continue working on reframing his self-description. Tr. at 597.

Plaintiff participated in group counseling on August 24, 2021. Tr. at 592. SW Ward noted Plaintiff made good use of the group treatment session, but showed minimal progress toward his goals and objectives. *Id.*

Plaintiff communicated with SW Tomlinson on August 31, 2021. Tr. at 590. He reported he had felt like a "burden" and started down a "rabbit hole" of suicidal thoughts after his wife commented negatively about caring for people at work all day and having to come home and care for him. Tr. at 591. He indicated he had recently exercised at the pool and continued to train with the service dog organization. *Id.* SW Tomlinson encouraged Plaintiff to reach out for greater connection with the service dog organization. *Id.*

On September 9, 2021, Dr. Pegram noted Plaintiff's anxious mood and normal perception and speech on MSE. Tr. at 588. Plaintiff stated he was "hard to live with" and was "driving his wife and family [away]" with symptoms of OCD. *Id.* Dr. Pegram planned to see Plaintiff weekly for exposure therapy. Tr. at 589.

Plaintiff appeared for a group counseling session focused on forgiveness on September 14, 2021. SW Ward noted Plaintiff made good use of the

session, but had made only minimal progress toward his goals and objectives. Tr. at 585–86.

Dr. Pegram noted anxious mood and normal perception and speech on September 16, 2021. Tr. at 583. Plaintiff provided a list of compulsive tasks that had caused him difficulty at home. *Id.* Dr. Pegram noted Plaintiff was struggling to make progress toward his goals, as he needed to work through many rituals. Tr. at 584.

Plaintiff participated in group counseling on September 21, 2021. Tr. at 576. SW Ward observed Plaintiff to be quiet/withdrawn with minimal contribution and making minimal progress toward his goals and objectives. Tr. a 577.

On September 23, 2021, Dr. Pegram observed Plaintiff's anxious mood and normal perception and speech. Tr. at 575. Plaintiff reported he was working to ignore his repetitive thoughts. *Id.* He noted his wife often had to remind him to shower and he was only doing so once a week. *Id.*

Dr. Pegram noted Plaintiff's anxious mood and normal speech and perception on September 30, 2021. Tr. at 572. Plaintiff reported he typically woke with panic and hopelessness, but the medication was helping. *Id.* He indicated he was struggling with exposure therapy, but wanted to continue it. *Id.*

Plaintiff followed up with Dr. Phelps for medication management on October 4, 2021. Tr. at 544. He reported Bupropion 300 mg was causing excessive agitation and lightheadedness and requested to decrease his dose to 150 mg daily. Tr. at 545. He indicated Prazosin had been helpful in decreasing his nightmares. *Id.* He endorsed recent guilt over his son's having drawn a picture of him and his wife arguing and noted he was going to try to be more aware of his son's sensitivity. *Id.* He said he had recently experienced a lot of anxiety and emotional distance in his marriage and had contacted the suicide hotline due to passive suicidal thoughts. *Id.* Dr. Phelps noted the following on MSE: appropriately dressed and groomed; attention and concentration "basically within normal limits"; full range of affect; significant somatization; no psychomotor agitation or retardation; normal rate, volume, and amount of speech; organized and coherent thought processes; denied suicidal or homicidal ideation or plan; denied auditory and visual hallucinations and delusions; grossly intact recent and remote memory; and adequate insight and judgment. Tr. at 547. She assessed PTSD with some associated secondary anxiety and panic attacks, generalized anxiety, and OCD symptoms, as well as mixed anxiety disorder with generalized anxiety, OCD symptoms, and panic attacks. *Id.* She indicated a GAF score of 53, reduced Bupropion, and continued Plaintiff's psychotherapy and other medications. Tr. at 547–48.

Dr. Pegram observed Plaintiff to demonstrate euthymic mood and normal perception and speech on an MSE on October 7, 2021. Tr. at 539. She noted Plaintiff's therapy sessions had increased from biweekly to weekly to address an increase in symptoms. *Id.* Plaintiff indicated he was struggling with OCD, but had noticed a decrease in cycles of obsessions and compulsions. Tr. at 539–40.

On October 14, 2021, Dr. Pegram noted depressed mood and normal perception and speech on an MSE. Tr. at 534. Plaintiff related a recent dispute with his wife about their farm animals. *Id.* He explained the responsibility of caring for the animals increased his anxiety, but his wife said she would leave the marriage if he forced her to get rid of the animals. *Id.* He reported his body was not metabolizing Bupropion. *Id.* He said he no longer found joy in things he previously enjoyed and felt as if he were walking in a haze. *Id.*

Dr. Pegram observed depressed mood, normal perception, and normal speech on October 21, 2021. Tr. at 514. She noted Plaintiff consistently lost his thought process in the middle of a sentence. *Id.* Plaintiff reported he had not engaged in any OCD rituals over the prior week. *Id.*

On November 4, 2021, Dr. Pegram noted depressed mood, normal perception, and normal speech. Tr. at 511. Plaintiff reported he had recently punched a hole in the bathroom door when his wife told him she did not want

to continue a conversation with him. *Id.* He expressed his fear that his wife might end their marriage due to his behavior. *Id.* Dr. Pegram discussed marriage counseling, and Plaintiff and his wife agreed to proceed with it. *Id.* She noted Plaintiff was tearful, engaged, insightful, and concerned. *Id.*

On November 15, 2021, Dr. Pegram observed Plaintiff to have anxious mood, normal perception, and normal speech. Tr. at 508. Plaintiff indicated things were "not so good" between him and his wife because they were not being their authentic selves. *Id.*

Dr. Pegram observed Plaintiff to have euthymic mood, normal perception, and normal speech on November 29, 2021. Tr. at 489. Plaintiff complained he was having to "think har[d] in order to put a sentence together" and was "often losing his words." *Id.* He endorsed nightmares two to three times per week and indicated had not had a good night's sleep in a while. *Id.* Plaintiff's score of 24 on the PHQ-9 suggested severe depression. Tr. at 490–91.

On December 17, 2021, Dr. Pegram noted depressed mood, normal perception, and normal speech on MSE. Tr. at 470. Plaintiff reported some improvement in his home situation. *Id.* He indicated bonding with his animals had helped him to feel less anxious. *Id.*

Plaintiff participated in a medication management and supportive therapy visit with Dr. Phelps on January 7, 2022. Tr. at 453–60. He reported

17

depression, irritability, ruminative anxiety about financial stress, and anger. Tr. at 454. Dr. Phelps noted Plaintiff was appropriately dressed and groomed, had attention and concentration "basically within normal limits," showed a full range of affect, participated well during the session, endorsed no current suicidal or homicidal thoughts or psychosis, and had adequate insight and judgment. Tr. at 455. She assessed a primary diagnosis of PTSD with some associated general anxiety and panic attacks and OCD symptoms, as well as mixed anxiety disorder with generalized anxiety, OCD symptoms, and panic attacks. Tr. at 456. She renewed Plaintiff's psychiatric plan and assessed a GAF score of 53. *Id.* She continued Plaintiff's other medications and added 25 mg of Sertraline each morning to target continued PTSD, irritability, depressed mood, and ruminative anxiety. Tr. at 457.

Plaintiff participated in a Program of Comprehensive Assistance for Family Caregivers ("PCAFC") veteran assessment on March 23, 2022. Tr. at 417. He reported he drove his children one to two minutes to and from school, but his wife rode with him more often than not. Tr. at 419. He said he was able to keep his children busy playing video games if his wife had to do something. *Id.* He indicated it had taken months of encouragement, reframing, and accommodation from his wife to convince him to attend a dentist's visit. Tr. at 419. He stated he was so caught up in his irritability following the visit that he responded coldly to a positive report from his

daughter and did not share in her excitement. *Id.* He said he had a daily chore list, but failed to complete it on most days. *Id.* He said he drove no more than 20 to 30 minutes at a time on back roads without traffic and with his service dog. *Id.* He explained that prior to being laid off from his job due to COVID, his employer had accommodated him by allowing him to work on a separate machine in a building by himself, after multiple confrontations with others. Tr. at 419–20. He reported he was able to complete a significant portion of his education online and would sit alone in the back if in-person attendance was required. Tr. at 420. He described a good day as one in which he started his day when his children woke, ate breakfast, drove or accompanied his wife as she drove their children to school, performed some chores, played video games, ate lunch when prompted, drove or rode with his wife to pick up their children, ate dinner, and played video games or sat on the couch. *Id.* He said he tended to "zone out" when his wife was away. *Id.* He described a bad day as one in which he stayed in bed and did not clean himself, eat, or shower. *Id.* He estimated he experienced bad days 80% of the time. *Id.* He endorsed significant benefit from his service dog's ability to anticipate his panic attacks. Tr. at 423. Plaintiff's score of 20 on the PHQ-9 suggested severe depression. Tr. at 423–24.

Plaintiff and his wife participated in a PCAFC veteran function assessment instrument on April 4, 2022. Tr. at 401. Plaintiff reported the

ability to physically feed himself and microwave meals, but his wife interjected that he needed daily reminders to eat and that she kept quick snacks and prepared meals accessible to him. *Id.* Plaintiff stated that despite a history of panic attacks in stores, he enjoyed grocery shopping with his wife and service dog, but his wife indicated that his ability to shop depended on "how he [was] doing that day." *Id.* Plaintiff endorsed abilities to perform personal grooming tasks with reminders from his wife and indicated his wife cut his hair because it was awkward for him to have someone else do it. Tr. at 404. He said his wife attended treatment visits with him, organized his pill planner, and reminded him to take his medications. Tr. at 408.

On April 7, 2022, Dr. Pegram observed the following on MSE: alert and oriented times three; logical thought process; euthymic mood; and normal speech rate, rhythm, tone, and volume. Tr. at 397. Plaintiff reported he and his wife were working on their relationship and had been rehoming their farm animals because they were considering a move. *Id.* He noted OCD symptoms were still a concern and he had sold his computer in an effort to prevent himself from buying and returning items. Tr. at 398.

On April 15, 2022, Dr. Pegram completed a psychiatric/psychological impairment questionnaire, which is set forth in detail below. Tr. at 328–32.

Plaintiff requested NP Hebberd complete service dog paperwork on April 19, 2022. Tr. at 1015. His score of 15 on the PHQ-9 suggested

moderately-severe depression and his score of 21 on the GAD-7 indicated severe anxiety. *Id.* NP Hebberd noted Plaintiff was cooperative with the exam and demonstrated good eye contact, judgment, and insight. Tr. at 1016. She completed service dog paperwork. *Id.*

Dr. Pegram observed Plaintiff to demonstrate euthymic mood, normal perception, and normal speech on April 25, 2022. Tr. at 376. Plaintiff discussed a plan to move to North Carolina and his mother's decision to divorce his stepfather and indicated he had experienced a panic attack during the prior week "due to so many changes in his life." *Id.* Dr. Pegram noted Plaintiff was making good progress toward controlling his emotions and evaluating triggers. *Id.*

On May 2, 2022, the VA's caregiver support program team denied Plaintiff family caregiver services. Tr. at 367–68.

On May 16, 2022, Dr. Pegram noted depressed mood, normal perception, and normal speech on MSE. Tr. at 365. Plaintiff reported his family was planning to move to South Carolina, they had accepted an offer to purchase their house, and his wife was scheduled to start a new job on July 25. *Id.*

Dr. Pegram recorded depressed mood and normal perception and speech on June 16, 2022. Tr. at 827. Plaintiff reported the offer on his current home had fallen through and he was being outbid in his offers on houses in

South Carolina. *Id.* He indicated he and his wife had attended a couple's therapy session and it had gone well. *Id.* He said he had developed closer relationships with his animals and had stopped buying and returning things. *Id.* He reported improved responses and feeling "a lot less angry." *Id.* Dr. Pegram noted Plaintiff was feeling anxious about moving to another state and having to find a house. *Id.*

On June 20, 2022, state agency psychological consultant Jerry Csokasy, Ph.D. ("Dr. Csokasy"), completed a psychiatric review technique ("PRT") in which he considered Listing 12.15 for trauma and stressor-related disorders. Tr. at 60–61. He found Plaintiff had mild difficulties understanding, remembering, or applying information; moderate difficulties interacting with others; moderate difficulties concentrating, persisting, or maintaining pace; and moderate difficulties adapting or managing oneself. Tr. at 60. He wrote: "GIVEN OVERALL EVIDENCE CLMT IS ABLE TO PERFORM AT LEAST SIMPLE/ROUTINE TASKS ON A SUSTAINED BASIS IN LOW STRESS ENVIRONMENT WITH MINIMAL CONTACT WITH OTHERS." Tr. at 61. Dr. Csokasy considered Plaintiff moderately limited in his abilities to: carry out detailed instructions; maintain attention and concentration for extended periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. Tr. at 62–63.

On June 22, 2022, Plaintiff reported things were "pretty excellent," as he had sold his home, his wife had secured a job, and they were planning to close on a new home in South Carolina in July. Tr at 820. He stated his current combination of medications was the "most helpful he ha[d] been on" and his mood had been good. *Id.* Dr. Phelps recorded normal findings on MSE and continued Plaintiff's medications. Tr. at 821–22. She assessed a GAF score of 53. Tr. at 821.

Anthony Gensterblum, Ph.D. ("Dr. Gensterblum"), completed a second PRT on August 16, 2022. Tr. at 69–70. He considered the same listing and indicated the same degree of mental limitation in each area of mental functioning as Dr. Csokasy. *Compare* Tr. at 60, *with* Tr. at 69. He wrote: "Clmt remains capable of simple, routine tasks on a sustained basis in a low stress environment with minimal contact with others." Tr. at 70. He indicated the same moderate limitations as Dr. Csokasy on a mental residual functional capacity ("RFC") assessment. *Compare* Tr. at 62–63, *with* Tr. at 71–72.

Plaintiff presented to nurse practitioner Michelle Stouffer ("NP Stouffer") for a mental health consultation on September 19, 2022. Tr. at 1059. He reported a history of PTSD and indicated his medications were helping to manage his symptoms. *Id.* He indicated he had experienced panic symptoms approximately six times since his move and had not experienced

suicidal ideation for seven-to-eight months. *Id.* He described OCD symptoms that manifested as having to have matching appliances and clothes matching his dog's leash. *Id.* He endorsed low frustration tolerance and said he often yelled. *Id.* He reported nightmares about once a week. *Id.* He noted hypervigilance and hyper-startle response. *Id.* NP Stouffer recorded normal findings on MSE. Tr. at 1064–65. She offered Plaintiff the opportunity to participate in group therapy, but indicated he could not continue the same individual therapy he had received in Michigan. Tr. at 1065. She explained to Plaintiff that evidence-based therapy ("EBT") would be time-limited. *Id.*

On September 27, 2022, Plaintiff reported a couple of recent episodes, but doing okay overall. Tr. at 1054. NP Stouffer noted Plaintiff suffered from significant OCD behavior such that he had to act on his thoughts. Tr. at 1055. She recorded normal observations on MSE. Tr. at 1057. She completed a safety plan and continued Sertraline 50 mg, Prazosin 1 mg, Bupropion 150 mg, and Trazodone 50 mg. Tr. at 1058.

Plaintiff participated in group counseling sessions on September 28, October 5, 17, 21, 28, and 31, November 4, 7, 18, 21, 25, and 28, and December 12, 2022. Tr. at 1049–50, 1052–54, 1296–97, 1303–06, 1317–23, 1328–34.

Plaintiff reported being under a lot of stress on November 1, 2022. Tr. at 1324. He described a recent visit from his paternal grandfather, with

whom he did not have a good relationship. *Id.* He said his mother and grandmother were planning to move in with him, and he was concerned because his grandmother could be "difficult." *Id.* NP Stouffer emphasized the need for Plaintiff to engage in self-care and to speak with and spend time alone with his wife. *Id.* She noted Plaintiff had increased Sertraline to 100 mg on his own and agreed to continue the dose, as it appeared to be working well. *Id.* She noted normal findings on MSE. Tr. at 1326–27.

Plaintiff presented to Katie A. Rider Mundey ("Dr. Mundey") for a symptom assessment and treatment planning visit on December 8, 2022. Tr. at 1298. He endorsed frequent worry, difficulty controlling worry, irritability, occasional anger outbursts, skin picking, difficulties with attention and concentration, and panic attacks. *Id.* He described his panic attacks as involving rapid heartrate, difficulty breathing, shaking, feeling of loss-of-control over his body, lightheadedness, and dizziness. *Id.* He stated his panic attacks had occurred daily one month prior, but were presently occurring once or twice a week. *Id.* He endorsed a history of pronounced and functionally-impairing depression, but denied current depressive symptoms. *Id.* He said he had difficulty with decision-making, money management, and ruminative thoughts. *Id.* He endorsed a history of nightmares and indicated he often woke drenched in sweat. Tr. at 1299. He reported hypervigilance, intrusive memories related to his trauma experiences, and difficulty trusting

others and forming new relationships. *Id.* He stated he had no intention of seeking employment since having been deemed 100% disabled. *Id.* He said he focused his time and energy on strengthening his relationship with his wife and children. *Id.* Dr. Mundey recorded normal findings on MSE, aside from anxious mood and congruent affect. Tr. at 1300. She planned for Plaintiff to return on December 15 for cognitive behavioral therapy ("CBT") for anxiety. *Id.*

Plaintiff responded to the PHQ-9 and GAD-7 questionnaires on December 9, 2022. Tr. at 1301–02. His score of nine on the PHQ-9 was consistent with mild depressive symptoms, and his score of 19 on the GAD-7 showed severe anxiety. *Id.* Plaintiff also responded to the PTSD checklist, and his score of 42 was consistent with his PTSD diagnosis. Tr. at 1302.

On December 13, 2022, Plaintiff reported he had a lot planned over the following two weeks, including a trip to Michigan to help his mother move and visits from his and his wife's families. Tr. at 1291. He indicated he had experienced depressive symptoms over a two-week period and was experiencing panic attacks about twice a week. *Id.* He endorsed improved sleep. *Id.* He stated he did not feel that group counseling had been helpful. *Id.* NP Stouffer recorded normal findings on MSE. Tr. at 1294. She continued Plaintiff's medications. Tr. at 1294–95.

On December 15, 2022, Plaintiff reported he had experienced increased stress over the prior week as he planned a trip to Michigan to help his mother move. Tr. at 1287. He responses to the GAD-7 produced a score of 14, consistent with moderate anxiety symptoms. Tr. at 1289–90. Dr. Mundey noted anxious mood and congruent affect, but otherwise normal findings on MSE. Tr. at 1288.

On January 5, 2023, Plaintiff reported the prior few weeks had been challenging for him and he was "a mess." Tr. at 1281. He said he had experienced a panic attack when his grandfather unexpectedly showed up at his house for Christmas. *Id.* His score of 19 on the GAD-7 was consistent with severe symptoms. Tr. at 1283. Dr. Mundey noted anxious mood and congruent affect, but otherwise normal findings on MSE. Tr. at 1282.

Plaintiff participated in group counseling on January 23, 2023. Tr. at 1273.

On January 26, 2023, Plaintiff endorsed increased anxiety due to illness and adjustment to having his mother and grandmother in his home. Tr. at 1271. He reported more frequent panic attacks due to increased stress, but said he had managed to avoid agitation and irritation toward others. *Id.* Dr. Mundey noted anxious mood and congruent affect, but otherwise normal findings on MSE. Tr. at 1272.

Plaintiff reported he was "getting worse" on January 30, 2023. Tr. at 1264. He indicated he had been busy, as he had helped his mother moved to South Carolina and both his and his wife's families had visited over the holidays. Tr. at 1264–65. He endorsed more frequent panic attacks and requested Sertraline be reduced to 50 mg, as he felt the increased dose might be causing his problems. Tr. at 1265. NP Stouffer noted Plaintiff had left his dog at home and started to demonstrate panic symptoms during the visit, although he managed to avoid a full panic attack by taking off his sweatshirt. *Id.* She continued Plaintiff's other medications and reduced Sertraline to 50 mg. Tr. at 1268.

On February 2, 2023, Plaintiff's score of 19 on the GAD-7 was consistent with severe anxiety. Tr. at 1261. He reported elevated anxiety and indicated he had experienced panic attacks on most days over the prior week, although he felt he was managing his anxiety better than he had in the past. Tr. at 1262. He said he was experiencing increased stress due to his grandmother's presence in his home. *Id.* Dr. Mundey recommended breathing exercises and suggested Plaintiff set boundaries with his grandmother and leave his house for some period each day. *Id.* She noted anxious mood and congruent affect, but otherwise normal findings on MSE. Tr. at 1263.

Plaintiff participated in group counseling on February 6 and 13, 2023. Tr. at 1254, 1258–59. Dr. Mundey noted anxious mood and congruent affect,

but otherwise normal findings on MSE during a CBT session on February 16, 2023. Tr. at 1252.

On February 23, 2023, Plaintiff reported doing well over the prior week and making a concerted effort to reframe his anxious thinking. Tr. at 1248. His score of 17 on the GAD-7 was consistent with severe symptoms. Tr. at 1247.

### 3. Disability Rating Decisions from the VA

Plaintiff received combined disability ratings from the Department of Veterans Affairs ("VA") of 60% effective June 28, 2019, and 70% effective June 16, 2021. Tr. at 241.

In a rating decision dated February 15, 2022, the VA increased Plaintiff's disability rating for PTSD from 50% to 100%, effective October 8, 2021. Tr. at 237–40. The increased impairment rating was based on the following: anxiety; chronic sleep impairment; depressed mood; difficulty in adapting to a work-like setting; difficulty in adapting to stressful circumstances; difficulty in adapting to work; difficulty in establishing and maintaining effective work and social relationships; difficulty in understanding complex commands; disturbances of motivation and mood; flattened affect; forgetting to complete tasks; gross impairment in communication; gross impairment in thought processes; impaired abstract thinking; impaired impulse control; impaired judgment; impairment of short-

and long-term memory; intermittent inability to perform activities of daily living ("ADLs"); intermittent inability to perform maintenance of minimal personal hygiene; near-continuous depression affecting the ability to function independently, appropriately and effectively; near-continuous panic affecting the ability to function independently, appropriately, and effectively; neglect of personal appearance and hygiene; occupational and social impairment with deficiencies in work, school, family relations, judgment, thinking, or mood; panic attacks more than once a week; retention of only highly-learned material; suspiciousness; and unprovoked irritability with periods of violence.[5] Tr. at 238–39.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

Plaintiff testified he lived in a house with his mother, grandmother, wife, and two children, ages seven and 10. Tr. at 34. He stated his wife worked as an emergency medical technician ("EMT"). *Id.* He indicated he received disability benefits from the VA. Tr. at 35.

Plaintiff admitted he had a driver's license and was able to drive, although he did not like to do so. *Id.* He confirmed he had a bachelor's degree

---

[5] The rating was based on a VA examiner's observation of worsening symptoms on December 3, 2021. Tr. at 238. The notes from the December 3, 2021 exam do not appear in the record.

in business administration. *Id.* He stated he received unemployment benefits when he was terminated from his job due to the COVID-19 pandemic. *Id.* He indicated he had been self-employed as a copywriter and an editor in 2020 and 2021, but he did not do the work for long. Tr. at 36.

Plaintiff explained he had previously worked in production, operating several machines to make nuts and bolts. *Id.* He said the company had temporarily closed due to the pandemic, but he was not offered his job when it reopened. *Id.* He stated he previously worked in sales for three months at American Marketing and Smart Step Therapeutic prior to being let go, Tr. at 36–37, and worked for Drop as a property manager for a couple of months in 2013 and 2014, Tr. at 37–38.

Plaintiff testified he had been assigned to the infantry when he served in the Marine Corps. Tr. at 38. He said he had been promoted to squad leader and had been in charge of well-being, training, and combat-readiness for two fire teams. *Id.* He indicated he had worked as a gunner and other jobs in the Marine Corps. *Id.* He stated he had engaged in field and range training in California during periods he was not deployed to a combat zone. Tr. at 39.

Plaintiff explained he had attempted to return to work at the plant he worked in prior to the pandemic, as they had tried to accommodate his impairments, but they did not want him to return because he had "ruffled some feathers" in the past. *Id.* He said he had attempted to find work in

sales, but did not have good references. *Id.* He indicated he subsequently attempted to make money online, but suffered severe panic attacks. *Id.*

Plaintiff testified he had difficulty being around people in general, had difficulty understanding and paying attention, could not hear well, was easily frustrated, and was bothered by crowds. Tr. at 39–40. He said he had difficulty shopping and sitting in an office. Tr. at 40. He stated he had severe panic attacks and anger issues. *Id.* He indicated his migraines were mostly managed with medication. *Id.* He noted his IBS was severe and he had recently had "an accident" while he was in a store. *Id.*

Plaintiff explained he was taking Sertraline and Bupropion as antidepressants, Prazosin for nightmares, Loperamide for diarrhea, Trazodone, and medication to treat migraines when ibuprofen was ineffective. Tr. at 40–41. He denied smoking and using recreational drugs and said he rarely drank alcohol and did not keep it in his house. Tr. at 41.

Plaintiff testified that on a typical day, he would get his kids up and ready and drop off them at school and his wife at work. *Id.* He said he tried to do some housework, laundry, and dishes, although his mother and grandmother were helping him with those tasks. *Id.* He stated he liked to play video games in his free time. *Id.* He indicated he liked to play Over Watch and Genshin Impact, but could not handle them on some days because they were fast paced. Tr. at 42. He said he played Saturn on days he felt

stressed because it was "more of a relaxing game." *Id.* He explained Over Watch was a multiplayer game, but he turned off the chat feature because he had been banned from the game in the past for being too aggressive in the chat. *Id.* He estimated he played video games for a couple of hours during the day and a couple of hours after his family went to bed at night. *Id.* He stated he also enjoyed watching scary movies on Netflix. *Id.* He denied participating in any groups or regular activities outside his home, but said he took his service dog for a daily walk down the path in his neighborhood. Tr. at 42. He indicated he had tried photography for a few months and was looking for new hobbies. *Id.* He stated he had moved to South Carolina in August 2022 because he thought sunnier weather and cleaner air would benefit his mental health. *Id.*

Plaintiff testified he experienced panic attacks at least every other day, but would have more than one per day during periods of increased stress. Tr. at 43–44. He said he was working with his therapist to determine the triggers for his panic attacks, but had noticed they often occurred when he was forced to make a decision, no matter how small. Tr. at 44.

Plaintiff stated he had constant problems controlling his anger and irritability. *Id.* He said he had taken several anger management classes and continued to work on his anger during therapy sessions. *Id.* He indicated he did not often experience yelling outbursts because he would remove himself

from the situation to avoid snapping. Tr. at 44–45. He explained he experienced anxiety much more often than depression, with depressive symptoms occurring less than once a week. Tr. at 45. He said he would experience one to two days of "a pretty hard depressed mood" about once a month. *Id.* However, he noted he had experienced periods of depression that lasted several weeks in the past. *Id.* He explained that during those periods, he did not want to do anything, hated himself and everything, and had experienced suicidal ideations. *Id.*

Plaintiff testified he felt suicidal all the time, was miserable, and fought with his coworkers and boss when he worked at the plant. Tr. at 45–46. He stated he had found it more difficult to manage his mental health symptoms as he moved from job to job. Tr. at 46. He explained he had worked through his work-related struggles with his counselor and doctor and his doctor had started talking about the possibility of him not returning to work. *Id.*

Plaintiff testified he was not really motivated to engage in personal hygiene tasks. Tr. at 47. He said he could easily go a week without taking a shower. *Id.* He stated his wife would ask if he had taken his pills, request that he change his underwear, and come home during the day to make sure he ate lunch and to remind him of doctors' appointments. *Id.* He indicated that while he was capable of driving, he preferred not to do so because traffic

stressed him out. *Id.* He noted his wife did most of the driving when she was able. *Id.*

Plaintiff testified the severity of his symptoms varied from day to day. *Id.* He said he had recently experienced a panic attack in Home Depot. *Id.* He stated that about two to three times a week, he realized upon waking in the morning that he was going to have a bad day. Tr. at 47–48.

Plaintiff explained he had trained with his dog for eight months prior to receiving her service certification. Tr. at 48.

>           b.    Vocational Expert Testimony

Vocational Expert ("VE") William Crunk, Ph.D., reviewed the record and testified at the hearing. Tr. at 49–55. The VE categorized Plaintiff's PRW as a credit machine operator, *Dictionary of Occupational Titles* ("*DOT*") No. 615.685-030, requiring medium exertion and a specific vocational preparation ("SVP") of 3; a storage clerk, *DOT* No. 295.367-026, requiring light exertion and an SVP of 2; and a flooring/covering salesman, *DOT* No. 270.357-026, requiring light exertion and an SVP of 4. Tr. at 50–51, 54. The ALJ described a hypothetical individual of Plaintiff's vocational profile who had no exertional limitations; could have occasional, superficial, interaction with coworkers and the public; could handle only occasional changes in the work setting; and could perform simple and routine tasks for two-hour periods with regular work breaks. Tr. at 51–52. The VE testified the hypothetical

individual would be able to perform Plaintiff's PRW as a machine operator. Tr. at 52. The ALJ asked whether there were any other jobs in the economy that the hypothetical person could perform. *Id.* The VE identified light jobs with an SVP of 2 as a packer, *DOT* No. 559.687-074, a bakery worker, *DOT* No. 524.687-022, and a laundry sorter, *DOT* No. 361.687-014, with 55,000, 44,000, and 56,000 positions in the national economy, respectively. *Id.*

The ALJ asked the VE if his testimony had been consistent with the *DOT*. *Id.* The VE explained the job descriptions were consistent, but the *DOT* did not account for interpersonal relationships and off-task behavior-type questions. Tr. at 52–53. He stated that part of his testimony was based on his professional background, education, and experience. Tr. at 53. The ALJ asked the VE if all the jobs he had identified had a GED reasoning level of one or two. *Id.* The VE confirmed that they did, but subsequently clarified the jobs he identified were consistent with a GED reasoning level of 1 or 2, but Plaintiff's PRW as a machine operator was not. *Id.* The ALJ asked the VE if an individual limited to simple, routine tasks could perform the machine operator job. *Id.* The VE stated it was a little more involved than simple, routine, and repetitive tasks. *Id.* However, he subsequently indicated it was consistent with a GED reasoning level of 2 and simple, routine tasks. Tr. at 54.

Plaintiff's counsel asked the VE to consider that for one-third of the workday, the individual would be unable to maintain attention and concentration for extended periods, work in coordination with others without being distracted by them, and complete a workday without interruptions. *Id.* He asked if there would be any jobs this person could perform. *Id.* The VE testified there would be no jobs. *Id.*

Plaintiff's counsel asked the VE to assume that for one-third of the workday, the individual would be unable to get along with coworkers or peers without distracting them, perform socially-appropriate behavior, and maintain standards of cleanliness. *Id.* He asked if there would be any jobs available. *Id.* The VE stated there would be no jobs. Tr. at 55.

Plaintiff's counsel asked the VE to consider that the individual would be absent from work at least three times per month on a consistent basis. *Id.* He asked if there would be jobs. *Id.* The VE stated there would not. *Id.*

Plaintiff's counsel asked the VE if employers were generally inclined to allow an employee to use a service dog in the workplace. *Id.* The VE stated that some employers would allow it and some would not, and certain jobs, such as those in the food industry, would be ruled out. *Id.*

###### 2. The ALJ's Findings

In her decision dated March 15, 2023, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2025.

2.    The claimant has not engaged in substantial gainful activity since March 13, 2020, the alleged onset date (20 CFR 404.1571, *et seq.*).

3.    The claimant has the following severe impairments: PTSD, anxiety disorders, and depression (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: occasional superficial contact with coworkers and the public; occasional changes in the work setting; can perform and sustain, simple, routine tasks for two-hour periods with regular work breaks.

6.    The claimant is capable of performing past relevant work as a machine operator. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from March 13, 2020, through the date of this decision (20 CFR 404.1520(f)).

Tr. at 16–22.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ failed to properly evaluate Dr. Pegram's medical opinion;

2)    the ALJ did not properly consider his subjective statements; and

3)    the ALJ presented a flawed hypothetical question to the VE.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[6] (4)

---

[6] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20

whether such impairment prevents claimant from performing PRW;[7] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[7] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d

287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Medical Opinions

In the April 2022 psychiatric/psychological impairment questionnaire, Dr. Pegram noted she saw Plaintiff twice a month for CBT sessions, first

treated him on January 26, 2021, and last examined him on April 7, 2022. Tr. at 328. She identified Plaintiff's diagnosis as chronic PTSD due to multiple war deployments. *Id.* She indicated her diagnosis and assessment were supported by the following signs and symptoms: depressed mood; persistent or generalized anxiety; abnormal affect; feelings of guilt or worthlessness; hostility or irritability; manic syndrome; obsessions or compulsions; difficulty thinking or concentrating; poor immediate memory; intensive recollections of a traumatic experience; paranoia/suspiciousness; persistent irrational fears; recurrent panic attacks; vigilance and scanning; anhedonia/pervasive loss of interest; decreased energy; impulsive or damaging behavior; intense and unstable interpersonal relationships; pathological dependence, passivity, or aggressiveness; psychomotor abnormalities; and other sleep disturbances with Trazodone prescribed for sleep and Prazosin for nightmares. Tr. at 329. She explained Plaintiff's most frequent or severe symptoms included panic attacks, OCD, and depression, all related to PTSD. Tr. at 330.

Dr. Pegram noted the PHQ-9 showed major depression and the GAD-7 showed severe anxiety. *Id.* She stated Plaintiff had "[s]udden panic attack symptoms when in public that trigger[ed] severe physical reactions when there [was] no real danger or apparent cause." *Id.* She rated Plaintiff as having marked limitation in his abilities to remember locations and work-like procedures and understand and remember detailed instructions. Tr. at 331.

Dr. Pegram assessed moderate-to-marked limitations in Plaintiff's abilities to: carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or near others without being distracted by them; complete a workday without interruptions from psychological symptoms; interact appropriately with the public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them; maintain socially-appropriate behavior; adhere to basic standards of neatness; respond appropriately to workplace changes; and travel to unfamiliar places or use public transportation. *Id.* She considered Plaintiff moderately limited in his abilities to: understand and remember one- to two-step instructions; carry out simple, one- to two-step instructions; sustain ordinary routine without supervision; be aware of hazards and take appropriate precautions; and set realistic goals. *Id.* She estimated Plaintiff would be absent from work more than three times per month as a result of his impairments or treatment. Tr. at 332.

Plaintiff argues the ALJ failed to properly evaluate Dr. Pegram's opinion in accordance with 20 C.F.R. § 404.1520c. [ECF No. 9 at 11–17]. He maintains the ALJ did not provide adequate reasons for finding Dr. Pegram's opinion "not persuasive," as the record contradicts her conclusion that Dr. Pegram provided "minimal supporting explanation." *Id.* at 11–12. He claims

the ALJ failed to consider the consistency of the abnormalities identified in Dr. Pegram's opinion and the treatment record. *Id.* at 14. He asserts that in discounting Dr. Pegram's opinion based on his modest improvement, the ALJ did not consider the overall diagnostic record or the effect of modest improvement on his ability to persist in a work environment. *Id.* at 14–15. He argues the ALJ erred in characterizing his treatment as conservative and allocating persuasive weigh to the state agency consultants' opinions based on this "conservative" treatment. *Id.* at 15–16.

The Commissioner argues the ALJ properly found Dr. Pegram's check-the-box form unsupported and inconsistent with the record. [ECF No. 12 at 10]. She maintains the ALJ appropriately found the opinion was not persuasive based on its minimal explanation and inconsistency with the medical evidence, which mostly showed that Plaintiff's symptoms responded to medication and his therapy was based on marital and domestic issues. *Id.* at 10–11. She argues the ALJ did not discount Dr. Pegram's opinion as based on a particular source or methodology, but, instead, discounted it because it lacked sufficient explanation. *Id.* at 12. She contends the ALJ's statement that she considered the entire record is sufficient to indicate she considered Dr. Pegram's notes in evaluating the consistency of her opinion. *Id.* at 12. She asserts the ALJ properly found the state agency consultants' opinions persuasive and adequately explained her reasons for doing so. Tr. at 14, 16.

45

She notes the ALJ may consider a claimant's course of treatment conservative when the record reasonably supports such a finding. *Id.* at 15.

In her reply, Plaintiff disputes the Commissioner's characterization of Dr. Pegram's opinion as a "check-the-box form," as it includes detailed written explanations. [ECF No. 13 at 1]. She maintains the Social Security Administration uses such forms itself and has encouraged claimants to use these forms. *Id.* at 2.

An ALJ is required to evaluate all the medical opinions of record based on these factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the medical opinion. 20 C.F.R. § 404.1520c(b), (c). However, she is only required to discuss the supportability and consistency of each medical source's opinion, as these factors are considered most important in assessing its persuasiveness. 20 C.F.R. § 404.1520c(a), (b)(2). Evaluation of the supportability factor requires the ALJ to consider a medical opinion more persuasive based on "the more relevant . . . objective medical evidence and supporting explanations" the medical source provides. 20 C.F.R. § 404.1520c(c)(1). The ALJ's assessment of the consistency factor requires she consider a medical source's opinion more persuasive if it is consistent "with the evidence from other medical sources and nonmedical sources in the claim." 20 C.F.R. § 404.1520c(c)(2).

Although ALJs have discretion in evaluating the persuasiveness of medical opinions, substantial evidence must support the ALJ's conclusions as to the supportability and consistency factors. If the ALJ materially errs in evaluating these factors, the court may remand the case. *See Flattery v. Commissioner of Social Security Administration*, C/A No. 9:20-2600-RBH-MHC, 2021 WL 5181567, at *8 (D.S.C. Oct. 21, 2021) (concluding the ALJ's evaluation of the supportability factor was not supported by substantial evidence where he ignored the claimant's continuing treatment with the medical provider and portions of the provider's treatment notes), *R&R adopted by* 2021 WL 5180236 (Nov. 8, 2021); *Joseph M. v. Kijakazi*, C/A No. 1:20-3664-DCC-SVH, 2021 WL 3868122, at *13 (D.S.C. Aug. 19, 2021) (finding the ALJ erred in assessing a medical opinion pursuant to 20 C.F.R. § 404.1520c and § 416.920c because he misconstrued the date the plaintiff last saw the medical provider, neglected the continuing treatment relationship, and erroneously claimed the last treatment visit was prior to the plaintiff's alleged onset date), *R&R adopted by* 2021 WL 3860638 (Aug. 30, 2021).

The ALJ addressed Dr. Pegram's opinion as follows:

> According to Maxine Pegram, PsyD, the claimant's therapist, the claimant has marked limitations in understanding and remembering work procedures and detailed instructions, moderate to marked limitations in concentration and persistence, moderate to marked limitations in social interactions, and moderate to marked limitations in responding appropriately to workplace changes, traveling to unfamiliar places, and using public transportation, and he would be absent from work more

47

than three times per month (Ex. 1F). This is not persuasive. This
check-the-box form contains minimal supporting explanation.
The only clinical evidence cited was a PHQ-9 showing major
depression, generalized anxiety disorder, and severe anxiety (Ex.
1F/3). The proposed limitations are not consistent with the
medical evidence, including Dr. Pegram's treatment records,
which document that the claimant's symptoms responded to
medication, and his therapy was focused primarily on marital
and domestic issues (Ex. 6F/25–131).

Tr. at 20–21.

In contrast, the ALJ found the state agency psychological consultants'
opinions to be "persuasive and supported by adequate explanation" as "[t]he
proposed limitations [were] consistent with the claimant's conservative
treatment history, good response to treatment, and benign mental status
examination findings." Tr. at 20.

The ALJ devoted just over two pages of the decision—including three
paragraphs of boilerplate language regarding symptom evaluation—to
explaining how the evidence, including the medical opinions, supported the
RFC assessment. *See* Tr. at 19–21. Despite Plaintiff's frequent treatment,
including medication management and individual and group counseling, the
ALJ's discussion of the treatment record is limited to five short paragraphs.

On its surface, the ALJ's decision addresses the supportability and
consistency factors in evaluating the persuasiveness of Dr. Pegram's opinion,
as she noted the opinion contained "minimal supporting explanation" and
was not consistent with treatment records. *See* Tr. at 20–21. However,

contrary to the direction in the regulation that the adjudicator consider the consistency between the medical opinion and "the evidence from other medical sources and nonmedical sources in the claim," 20 C.F.R. § 404.1520c(c)(2), the ALJ only considered the consistency of Dr. Pegram's opinion and her treatment records. Consequently, she neglected to address observations from NP Hebberd, Dr. Phelps, SW Ward, NP Stouffer, and Dr. Mundey that were arguably consistent with Dr. Pegram's opinion. At times, these providers noted Plaintiff demonstrated anxious, tearful, guarded, depressed, irritable and reactive mood and affect. *See, e.g.*, Tr. at 604, 707, 739, 753, 1009, 1252, 1263, 1272, 1282, 1300. SW Ward stated that despite his active participation in most group counseling sessions, Plaintiff was making minimal progress toward his treatment goals. *See, e.g.*, Tr. at 577, 585–86, 592, 599, 618, 624, 630. Dr. Phelps noted Plaintiff had a tendency toward minimization of symptoms and significant somatization. Tr. at 547, 668. NP Stouffer indicated Plaintiff demonstrated panic symptoms during a January 2023 visit. Tr. at 1264.

In explaining her finding that Dr. Pegram's opinion was not supported by her treatment record, the ALJ engaged in the cherry-picking the Fourth Circuit has warned against. *See Lewis v. Berryhill*, 858 F.3d 869 (4th Cir. 2017) ("An ALJ has the obligation to consider all relevant evidence and cannot simply cherrypick facts that support a finding of nondisability while

ignoring evidence that points to a disability finding.") (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)). She focused on the evidence that supported her conclusion and ignored evidence to the contrary.

The ALJ's statement that the "check-the-box form contain[ed] minimal supporting explanation" is not entirely accurate. In *Eastbrook v. Kijakazi*, __ F.4th __, (4th Cir. 2023), the court recently held an ALJ erred in discrediting a medical opinion provided on a check-off form. It explained that the physician "checked off boxes because that was the *required* reporting format." *Id.* (emphasis in original). The same is true in this case.

Although Dr. Pegram did not provide significant elaboration as to the symptoms and limitations she indicated, she identified specific limitations and symptoms that find support in her treatment records. Her treatment notes reflect her observations of Plaintiff's depressed, frustrated, and anxious mood and affect during most exams. *See, e.g.*, Tr. at 365, 470, 514, 534, 572, 588, 632, 660, 694, 701. She observed that Plaintiff often lost his train of thought, required redirection, and sometimes struggled to make progress toward goals. Tr. at 514, 584, 701. Her notes reflect Plaintiff's reports of panic attacks, irritability, OCD-related behavior, impulsiveness, anger, frustration, and relationship conflicts. *See, e.g.*, Tr. at 376, 398, 419, 511, 524, 539–40, 588, 595, 626, 632, 655, 716, 720.

The ALJ erred in discounting Dr. Pegram's opinion based on her reliance on Plaintiff's self-reported symptoms on the PHQ-9. In *Shelley C. v. Commissioner of Social Security Administration*, 61 F.4th 341, 361 (4th Cir. 2023), the Fourth Circuit stated "depression—particularly chronic depression—is one of those other diseases [that does not produce objective evidence]." It explained "symptoms of [major depressive disorder ("MDD")], like those of fibromyalgia, are '*entirely subjective*,' determined on a case-by-case basis." *Id.* (citing *Arakas v. Commissioner, Social Security Administration*, 983 F.3d 83, 106 (4th Cir. 2020) (emphasis added)). It further provided: "Ultimately, because of the unique and subjective nature of MDD, subjective statements from claimants 'should be treated as evidence substantiating the claimant's impairment.'" *Id.* at 361–62 (quoting *Arakas*, 983 F.3d at 97–98). Because Plaintiff suffered from depressive and other mental impairments, the ALJ was required to consider his reported symptoms as evidence substantiating his impairments.

While the ALJ was correct in noting that Plaintiff's symptoms responded well to medications at times, Plaintiff required multiple medication changes and adjustments over the relevant period, as discussed further below. To the extent the ALJ rejected Dr. Pegram's opinion based on Plaintiff's "conservative" treatment history, this was also error for the reasons explained below.

The ALJ further erred in finding Dr. Pegram's opinion less persuasive because Plaintiff's "therapy was focused primarily on marital and domestic issues." Given that Plaintiff was not employed over the relevant period and indicated he did not socialize with others outside his family, Dr. Pegram's therapy was reasonably focused on marital and domestic issues, as these were the only type of issues Plaintiff regularly encountered.

Remand is required given the ALJ's failure to follow the applicable regulation and adequately support her evaluation of the persuasiveness of the medical opinion evidence.

### 2.    Subjective Allegations

Plaintiff argues the ALJ erred in evaluating his subjective statements. [ECF No. 9 at 17–20]. He maintains the ALJ placed undue weight on his ADLs in rejecting his statements. *Id.* at 18. He asserts his ADLs do not contradict his allegations or establish his ability to work eight hours a day and 40 hours a week. *Id.* at 19. He claims the ALJ did not consider his subjective statements as required by 20 C.F.R. § 404.1529 and SSR 16-3p. *Id.* He notes the ALJ did not explain which portions of his testimony she considered not credible and her reasons for such findings. *Id.* at 20.

The Commissioner argues the ALJ appropriately compared Plaintiff's subjective allegations to the rest of the record. [ECF No. 12 at 16]. She maintains the ALJ explained that Plaintiff's medical records illustrated

improvement with therapy over the course of 2021; he indicated in spring 2022 that he could shop without panic attacks by using his service dog and could live independently and care for others; he reported in summer 2022 that he was much less angry, felt "pretty excellent," was "extremely happy" in his marriage, and his medications were the most helpful he had tried; and he indicated to his providers that he was a stay-at-home dad, took his kids to school, did housework, cleaned, and was working on writing a book. *Id.* at 18. She asserts the ALJ cited specific activities Plaintiff indicated he engaged in, treatment notes that showed his conditions improved with medication and therapy, and a denial of VA assistance because he did not require it. *Id.* She contends the ALJ did not consider Plaintiff's ADLs as suggestive of his ability to complete a normal workday, but instead considered them inconsistent with his allegations about what he could and could not do. *Id.* at 20.

The rules for evaluating a claimant's subjective allegations as to symptoms are found in 20 C.F.R. § 404.1529 and SSR 16-3p. "[A]n ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms." *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (citing 20 C.F.R. § 404.1529(b), (c)). "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Id.* at 866 (citing 20 C.F.R. § 404.1529(b)). After concluding the claimant has an impairment that could

reasonably produce the symptoms he alleges, the ALJ must proceed to the second step, which requires her to "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform basic work activities." *Id.* (citing 20 C.F.R. § 404.1529(c)).

In making the second determination, the ALJ must consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence." 20 C.F.R. § 404.1529(c)(4). Pursuant to this analysis, the ALJ should consider "statements from the individual, medical sources, and any other sources that might have information about the claimant's symptoms, including agency personnel," as well as the following factors:

(1)    the claimant's ADLs;

(2)    the location, duration, frequency, and intensity of the claimant's pain or other symptoms;

(3)    any precipitating or aggravating factors;

(4)    the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms;

(6)    any measures the claimant uses or has used to relieve pain or other symptoms (e.g., lying flat on his back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(7)    other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); SSR 16-3p, 2017 WL 5180304, at *6.

The ALJ is required to explain which of the claimant's alleged symptoms she considered "consistent or inconsistent with the evidence in [the] record and how [her] evaluation of the individual's symptoms led to [her] conclusions." SSR 16-3p, 2017 WL 5180304, at *8. "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* at *10. The ALJ must "build an accurate and logical bridge" between the evidence and her conclusion as to the intensity, persistence, and limiting effects of the claimant's symptoms. *Monroe*, 826 F.3d at 189.

The ALJ addressed Plaintiff's subjective allegations as follows:

The claimant alleges disability due to mental impairments that he claims cause panic attacks at least every other day, anger issues, anxiety, and occasional bouts of depression. According to the claimant, his symptoms limit his abilities to get along with others, be around other people, tolerate stress, understand instructions, maintain attention, and be motivated (Testimony; Ex. 4E).

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent

with the medical evidence and other evidence in the record for
the reasons explained in this decision.

Tr. at 19.

The ALJ discussed Plaintiff's treatment between December 2020 and
December 2021 and wrote: "This evidence indicates that his symptoms
responded well to treatment, such that he could tolerate low stress work with
limited social demands." Tr at 19–20. She referenced Plaintiff's report on a
Veteran Functional Assessment in April 2022, his mental health treatment
plan, and a May 6, 2022 denial of personal care services by the VA and noted
"[t]his suggests his symptoms are not as severe as alleged." Tr. at 20. She
cited normal psychiatric exam findings in June 2022 and Plaintiff's reports
that he was "a lot less angry," felt "pretty excellent," was "extremely happy"
in his relationship with his wife, and was taking "the most helpful"
combination of medications "he had been on." *Id.*

The ALJ mentioned Plaintiff's receipt of "conservative treatment,"
including group and individual therapy since October 2022 and his February
2023 report that he was managing his anxiety more effectively. *Id.* She wrote:

> According to treatment records, he is a stay-at-home dad; he
> takes the kids to school, does housework, cleans, and cooks; he is
> working on writing a book (Ex. 9F/88). Accordingly, he is capable
> of work involving occasional superficial contact with coworkers
> and the public, occasional changes in the work setting and
> simple, routine tasks.

*Id.*

The ALJ appears to have considered Plaintiff's statements of improvement to the exclusion of his statements describing symptom exacerbations. For example, the ALJ pointed out Plaintiff's positive reports during some exams, Tr. at 19–20, but ignored his indications of increased panic attacks and irritability during other visits. *See, e.g.*, Tr. at 419, 454, 604, 644, 655, 1262, 1265, 1271, 1291, 1298. She discussed elements of the veteran functional assessment that were consistent with her conclusion, but ignored Plaintiff's and his wife's reports that he needed daily reminders to eat and take medication, his ability to go shopping was dependent on how he was otherwise doing that day, he needed reminders and encouragement to complete grooming tasks, he went days without showering or changing his clothes, and he failed to respond to notification of a gas leak within his home. Tr. at 401–09. The ALJ considered Plaintiff's ability to perform several ADLs as indicative of his ability to work without considering reported limitations in completing other tasks, need for reminders, and inability to perform those tasks on all days. *See* Tr. at 401 (indicating his wife had to remind him to eat), 419 (noting difficulty driving), 404 (stating his wife reminded him to perform grooming tasks), 420 (indicating on bad days, he stayed in bed and did not clean himself, eat, or shower), 751 (reporting being unable to get out of bed on some days due to depression). As noted above, the Fourth Circuit has found this cherry-picking to be problematic.

Although the ALJ claimed the VA's denial of personal care services suggested Plaintiff's impairments were not as severe as he alleged, she did not explain this conclusion. In denying Plaintiff's request for personal care services, social worker Cheryl A. Lucas explained:

> [T]he Veterans level of personal care needs do not meet eligibility requirements for PCAFC because the Veteran does not require hands-on assistance each time they complete at least one activity of daily living or have a need for supervision or protection based on symptoms or residuals of neurological or other impairment or injury, or a need for regular or extensive instruction or supervision without which the ability of the veteran to function in daily life would be seriously impaired for a minimum of six continuous months.

Tr. at 374–75. It is unclear how this denial was inconsistent with Plaintiff's allegations as to the intensity, persistence, and limiting effects of his symptoms because he did not claim he required hands-on assistance each time he completed ADLs or regular or extensive instruction or supervision without which he could not function in daily life.

The ALJ's characterization of Plaintiff's treatment as "conservative" is difficult to reconcile with the record. "A growing number of district courts have held that in cases where claimants consume antidepressant, anticonvulsant, and/or antipsychotic drugs, consistently attend visits with mental health professionals, and endure constant medication adjustment and management, their treatment is classified as anything but 'routine and conservative.'" *Shelley C.*, 61 F.4th at 363. Over the relevant period, Plaintiff

was prescribed Prozac (antidepressant), Buspirone (antiaxiolytic), Trazodone (antidepressant), Bupropion (antidepressant), Venlafaxine (antidepressant), and Sertraline (antidepressant). Tr. at 606–07, 644, 646–47, 685, 737–38, 1005, 1009, 1268. Between December 2020 and February 2023, Plaintiff participated in 30 individual therapy sessions, 24 group counseling sessions, and 14 medication monitoring visits. His providers adjusted his medications nine times to address increased symptoms and side effects. *See* Tr. at 547–48, 606–07, 685, 705, 707, 737–38, 1009, 1268, 1324. Plaintiff's treatment history suggests more than "conservative" treatment. *See Lewis*, 858 F.3d 869 ("In light of the extensive treatment Lewis received for her various conditions, the ALJ's designation of Lewis's course of treatment as "conservative" amounts to improperly 'playing doctor' in contravention of applicable regulations." (citing 20 C.F.R. §§ 404.1529, 416.929; *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015) ("The ALJ's conclusion is not supported by any medical evidence in the record; it amounts to the ALJ improperly playing doctor.")).

For all of the foregoing reasons, the court finds the ALJ did not comply with the relevant regulations, SSRs, and Fourth Circuit precedent in evaluating Plaintiff's allegations as to the intensity, persistence, and limiting effects of his symptoms.

### 3.  VE Hypothetical

Plaintiff argues the ALJ failed to present a hypothetical question to the VE that accurately described his mental limitations. [ECF No. 9 at 20]. He asserts the ALJ did not include sufficient limitations in the RFC assessment to account for the moderate limitations she found in concentrating, persisting, or maintaining pace and adapting or managing oneself. *Id.* at 20–21.

The court declines to address Plaintiff's third allegation of error with specificity in light of the recommendation for remand on other grounds. Because the ALJ did not adequately assess the medical opinion evidence and Plaintiff's statements as to his symptoms, she should also reevaluate the degree of limitation his impairments imposed in concentrating, persisting, or maintaining pace and adapting or managing oneself and include in the RFC assessment all limitations reasonably supported by the evidence.

## III.  Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

December 20, 2023                                    Shiva V. Hodges
Columbia, South Carolina                    United States Magistrate Judge